# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant First Class QUANTRELL L. ANDERSON**
**United States Army, Appellant**

ARMY 20170158

Headquarters, U.S. Army Aviation Center of Excellence
Richard J. Henry, Military Judge
Lieutenant Colonel Leslie A. Rowley, Staff Judge Advocate

For Appellant:  Captain Heather M. Martin, JA; William E. Cassara, Esquire (on brief and reply brief).

For Appellee:  Colonel Steven P. Haight, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Allison L. Rowley, JA (on brief).

21 February 2019

---------------------------------
OPINION OF THE COURT
---------------------------------

SCHASBERGER, Judge:

Maltreatment of subordinates is a criminal offense specific to the military. Military leaders hold unique and far-reaching authority over junior enlisted soldiers. This authority comes with obligations.  One such obligation is the requirement to treat subordinate soldiers with a basic level of dignity and respect.  Maltreatment is an offense against such dignity and respect, and thus an offense against the bedrock of military order and discipline.  For this reason, conduct that would not be criminal in any civilian context may constitute the offense of maltreatment if directed toward subordinate soldiers by military superiors.  Such is the case here.

A panel with enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of three specifications of maltreatment and one specification of abusive sexual contact in violation of Articles 93 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 893 and 920.  The panel sentenced appellant to a bad-conduct discharge, thirty months of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority

approved the adjudged sentence and credited appellant with four days against his sentence to confinement.  Appellant's case is now before us under Article 66, UCMJ.[1]

## BACKGROUND

Appellant was an Army air traffic controller (ATC) and served as the facility chief-in-charge of one of the control towers at Fort Rucker.  The tower command structure was, in descending order, the ATC Chief, facility chief, training supervisor, shift leaders, ATCs, and ATC trainees.  In November 2015, Specialist (SPC)[2] BK was assigned as an ATC trainee with duty in appellant's tower.

Over the course of the next few months, appellant and SPC BK exchanged hundreds of text messages.  While some of the messages were related to work, others were sexually suggestive, and some others were sexually explicit.  Appellant repeatedly asked for pictures of SPC BK in a sports bra and other workout attire.  In the messages, appellant offered the flimsy rationale that he wanted the pictures to evaluate SPC BK's progress in physical fitness.  For this purported reason, he directed SPC BK to provide him images showing "every nook and cranny" of her body.  Appellant also suggested he might implement "strip training."  Appellant explained that in "strip training," he would quiz SPC BK on professional topics and, if she answered incorrectly, she would have to strip for appellant or, in the alternative, allow him to perform oral sex on her.  Specialist BK's responses to these messages varied: some she ignored; some she responded to in-kind; and to some she responded by changing the subject.

In the very early morning of 1 January 2016, appellant called SPC BK and asked to come over and hang out with her at the barracks.  He made up a story of being locked out of his own residence.  Specialist BK agreed and said she was hanging out with friends.  Appellant texted, "I'm trying to see all u sexy girls."  Specialist BK texted back, "it's me, [SL], [S], and [PC]."  Appellant's response was,

---

[1] In matters raised under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), appellant argues the military judge erred in allowing improper sentencing evidence. We find no prejudicial error.  We are also satisfied appellant's conviction of abusive sexual contact is legally and factually sufficient.  We limit our further discussion to appellant's arguments regarding his convictions of maltreatment.

[2] When she first arrived at appellant's tower, SPC BK had the rank of Private First Class (PFC).  At some later date, she achieved the rank of SPC.  For consistency, we use her rank of SPC throughout this opinion.  At all relevant times, SPC BK was a PFC or SPC and therefore considered a junior enlisted soldier.

"[s]o long as it's females I'm good lol is that cool."[3] Of the three other soldiers, SL and PC were women and S was a man. Ultimately, SPC BK told appellant to let her know when he arrived and she and a friend would come out to meet him. Appellant asked what friend would accompany SPC BK, to which she responded, "[her] friend from Bravo Company."

When appellant arrived at the barracks, SPC BK and PFC PC came out to meet him. At that time, PFC PC did not know appellant's rank. Specialist S joined them shortly thereafter and the four soldiers went to SPC BK's barracks room.

In SPC BK's barracks room, SPC BK and PFC PC sat on the bed and appellant sat between them. Over the course of the next few hours, appellant repeatedly placed his arm around PFC PC, which PFC PC resisted by moving his arm off of her. Appellant and PFC PC also exchanged text messages while sitting next to each other. During this time, PFC PC learned that appellant was a senior NCO in SPC BK's tower. Appellant showed PFC PC his identification card.

At one point, PFC PC asked appellant to remove his hand from her stomach. Appellant responded by shoving his hand down PFC PC's pants and touching her vulva. Private First Class PC grabbed appellant's arm, removed his hand from her pants, and got up. Eventually, SPC BK and PFC PC got appellant to leave, in spite of his protests that he had nowhere to go.

Some of the texts appellant sent to PFC PC during this time included: "Come on so I can feel u up in privacy;" "I am wanting to taste you I have never done that b4 with a white female lol;" "Ok sorry for harassing you . . . Why you so mad;" and "Why won't u let me try. . . answer damn it lol."

In February 2016, after the Super Bowl, another junior air traffic controller in the unit, SPC SL, engaged in a text conversation with appellant regarding the outcome of the game. After a few messages were exchanged on this topic, appellant asked her if she wanted "to know a real secret." Upon her response of "ok," appellant sent the message: "When you arrived I wanted to do u."[4] Specialist SL reported the incident the next day and told SPC BK and PFC PC that she was reporting it. This led both SPC BK and PFC PC to report appellant's misconduct toward them as well.

---

[3] Because the text messages at issue are replete with acronyms and misspellings, we omit the use of "[sic]" when presenting the content of the texts.

[4] Appellant concluded this message with an "emoji" depicting a monkey covering its mouth with its hands.

3

**LAW AND DISCUSSION**

Appellant argues that his convictions of maltreating SPC BK and PFC PC are legally and factually insufficient.

We review legal and factual sufficiency de novo. *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," the court is "convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

The Manual for Courts-Martial sets out two elements in Article 93: (1) the victim was subject to the orders of the appellant; and (2) the appellant was cruel toward, oppressed, or maltreated the victim. *Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), pt. IV, ¶ 17.b. Our superior court has clarified that to affirm a conviction of maltreatment the evidence must prove: "(a) the accused *knew* that the alleged victim was subject to his . . . orders; (b) the accused *knew* that he . . . was making statements or engaging in certain conduct in respect to that subordinate; and (c) *when viewed objectively under all the circumstances*, those statements or actions were unwarranted, unjustified, and unnecessary for any lawful purpose and caused, or reasonably could have caused, physical or mental harm or suffering." *United States v. Caldwell*, 75 M.J. 276, 281 (C.A.A.F. 2016) (emphasis original).

The discussion in the *MCM* explains maltreatment must be measured by an objective standard. It further states: "[S]exual harassment may constitute this offense. Sexual harassment includes influencing, offering to influence, or threatening the career, pay, or job of another person in exchange for sexual favors, and deliberate or repeated offensive comments or gestures of a sexual nature." *MCM*, Part IV, ¶ 17.c.(2).

The flipside of giving military superiors extraordinary power over their subordinates is that they may be held accountable for abusing that power. As discussed below, we conclude appellant abused his power as an NCO by maltreating junior enlisted soldiers. Appellant's abuse of power lacked any lawful purpose and harmed soldiers subject to his orders. By abusing his power in this way, appellant committed the offense of maltreatment.

*A. Maltreatment of SPC BK*

Appellant argued at trial and on appeal that he cannot be guilty of maltreating SPC BK because she was an active and willing participant in the messages that constitute the basis of the specification.

Appellant's argument centers on the defense of consent. To address this argument, we examine three related issues. First, we define consent. Next, we establish how consent relates to the elements of maltreatment. Finally, we discuss whether it is a defense to maltreatment that an accused held a mistake of fact as to consent.

First, we note neither the text of the statute, nor the relevant Rule for Courts-Martial (R.C.M.), list consent as a defense to a charge of maltreatment. *See generally*, UCMJ art. 93; R.C.M. 916. In fact, the word "consent" does not even appear in the statute or discussions of Article 93. Consent is defined in the UCMJ, albeit in a different punitive article, as "a freely given agreement to the conduct at issue by a competent person." UCMJ art. 120(g)(8).

Next, we conclude consent is relevant to, but not dispositive of, allegations of maltreatment. Approaching the issue from an elemental analysis, we see that consent plays no role in the first two elements of maltreatment identified by our superior court—i.e. whether the accused knew that the alleged victim was subject to his orders, or whether the accused knew he was making statements or engaging in certain conduct toward that subordinate. Whether consent is relevant to the third element—that when viewed objectively, appellant's conduct was unwarranted, unjustified, and unnecessary for any lawful purpose and reasonably could have caused, physical or mental harm or suffering—is more complicated. On one hand, *Caldwell* tells us that the statements or actions are to be viewed objectively, which would lead to the conclusion that a victim's perspective is not relevant. *See* 75 M.J. at 280. On the other hand, the statements or actions need to be unwarranted, unjustified, and unnecessary for any lawful purpose and must have caused, or reasonably could have caused, physical or mental harm or suffering.

Can consent transform actions that would otherwise meet the third element of Article 93 into actions that do not? We think so. In some circumstances, consent may alter something with no lawful purpose into something that is lawful.[5] Similarly, consent can alter whether it is reasonable to believe an action will cause harm. Indeed, our superior court has held that consensual sexual relations between

_____

[5] For example, consent may transform otherwise assaultive behavior in recreational striking and grappling sports into lawful activity.

an NCO and a junior enlisted soldier do not necessarily constitute maltreatment. *United States v. Fuller*, 54 M.J. 107, 111-12, (C.A.A.F. 2000) (overruled on other grounds by *United States v. Miller*, 67 M.J. 385, 389 (C.A.A.F. 2009). In *Fuller*, our superior court found a maltreatment conviction was legally insufficient when there was "no evidence" rank disparity played any role in the junior soldier's consent and there was no evidence the junior soldier felt otherwise offended or harassed by the encounter. *Id.*

Understanding that consent *can* affect whether there was maltreatment, we turn to the question of whether any alleged consent *did* affect whether appellant committed maltreatment in this case. Again, assuming that SPC BK consented to the text messages, we ask whether such consent imbued appellant's conduct with a lawful purpose or made it objectively reasonable to believe SPC BK would suffer no physical or mental harm as a result. We conclude the answer is, "no."

Consent does not cure all wrongs. This is especially true in situations where consent is obtained through exertion of authority, or where overriding policy interests weigh against allowing leaders to harm their subordinates even with their subordinates' consent. In this case, the sexual text messages from a senior NCO facility chief to a junior soldier ATC trainee were unjustified and harmful despite any alleged consent by SPC BK. No amount of consent makes the text messages necessary or justified. Further, unlike in *Fuller*, appellant plainly used his rank as leverage to subject SPC BK to conduct that could reasonably cause her harm and suffering notwithstanding consent. For example, appellant's "strip training" plan was patently demeaning to SPC BK and flowed directly from appellant's rank and supervisory position. Similarly, appellant's attempts to convince SPC BK that he could be her "boss" and a "FWB"[6] would, at a minimum, likely erode SPC BK's confidence in the safety and professionalism of her workplace. Thus, unlike in *Fuller*, appellant repeatedly invoked his rank and authority when communicating harassing and offensive messages to SPC BK.

While we conclude appellant's claim would fail even if there was actual consent, we do not find SPC BK consented to all the communications at issue. Rather, SPC BK's testimony is replete with evidence that her participation was not always "freely given." Appellant is correct that there is evidence of SPC BK's willing participation in *some* of the sexual text discussions. The evidence of SPC

---

[6] Specialist BK interpreted "FWB" to be a "friend with benefits." The "benefit" being sex with appellant.

BK's participation, however, does not introduce reasonable doubt as to the harmfulness or the unjustified nature of appellant's communications as a whole.[7]

Finally, appellant's claim that he had a reasonable mistake of fact as to SPC BK's consent fails for at least two reasons. First, as discussed above, even if SPC BK did consent to the communications in question, consent would not have rendered appellant's actions harmless or justified. Second, "if an accused's knowledge or intent is immaterial as to an element, the ignorance or mistake is not a defense." R.C.M. 916(j)(1). As discussed above, the element of maltreatment that the conduct at issue must be "unwarranted, unjustified, and unnecessary for any lawful purpose and caused, or reasonably could have caused, physical or mental harm or suffering" is an objective test. *Caldwell*, 75 M.J. at 281. Appellant's alleged mistake of fact is, therefore, immaterial to the element at issue.

With the foregoing legal issues settled, and after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt appellant is guilty of the offense of maltreating SPC BK. *See Turner*, 25 M.J. at 325.

### B. Was PFC PC Subject to Appellant's Orders?

Appellant argues that his conviction of maltreatment of PFC PC is legally and factually insufficient. Appellant's argument is not that PFC PC consented to the text messages appellant sent her, but instead that there was no evidence that PFC PC was subject to his orders or had a duty to obey him.

For the purpose of our analysis, we find as fact: First, appellant was, at the time of the incident, a Sergeant First Class and senior ATC with duty as facility chief for one of Fort Rucker's control towers. Second, appellant knew PFC PC was a junior soldier, in the same battalion as he, and was in the same company as other junior soldiers who worked in his facility. Third, appellant first met PFC PC in the early morning of New Year's Day, in the parking lot of the barracks where PFC PC and SPC BK lived. Finally, PFC PC knew that appellant was an NCO and worked in the tower where SPC BK worked.

---

[7] When a junior enlisted soldier is communicating with an officer or NCO, it is not appropriate to interpret mere silence by the subordinate as affirmative consent to offensive behavior by his or her military superior. The inherently coercive nature of military authority may overcome a junior soldier's willingness to contradict or object to even clearly objectionable conduct by his or her superiors.

At trial, appellant argued that the government had not met its burden of showing that PFC PC knew appellant was an NCO and whether she knew that she had to follow his orders. As stated above, however, the knowledge requirement is not that PFC PC knew she had a duty to follow appellant's orders; the knowledge requirement is that "the *accused knew* that the alleged victim was subject to his . . . orders." *Caldwell*, 75 M.J. at 281 (emphasis on "accused" added).

On appeal, appellant's argument is that appellant did not know PFC PC was subject to his orders; specifically that there was no evidence that appellant knew PFC PC was a junior enlisted soldier. We find that SPC BK's text message to appellant stating that her friend was in Bravo Company clearly established PFC PC was a soldier, and in the same battalion as appellant. The totality of the circumstances, including PFC PC's age, friendship with other junior soldiers, and the location of the meeting in barracks for junior enlisted soldiers combine to establish that appellant knew PFC PC was a junior enlisted soldier.

To establish a violation of Article 93, the government must show not only that appellant knew PFC PC was subordinate in rank to him, but also that PFC PC was actually subject to appellant's orders and that appellant knew it. The question then becomes whether PFC PC's status as a junior enlisted soldier in appellant's battalion necessarily makes her subject to appellant's orders. We conclude it does.

While a direct supervisory relationship between appellant and PFC PC would make this an easy case to resolve, the lack of such direct supervision is not dispositive. The *MCM* explains the term "subject to his orders" includes "all persons, subject to the code or not, who by reason of *some duty* are required to obey the lawful orders of the accused, regardless whether the accused is in the direct chain of command over the person." *MCM*, Part IV, ¶17.c(1) (emphasis added).

We recognize that the question of who is "subject to the orders of" whom has been addressed before, most recently in our court by *United States v. Keller*, 2018 CCA LEXIS 463, *9-14 (Army Ct. Crim. App. 26 Sept. 2018). In *Keller*, we acknowledged that there is no definitive answer in case law or statute to the question of when a junior enlisted soldier is subject to the orders of a superior enlisted soldier. *Id.* at *11. We observed there is a difference between charges of disobeying a commissioned officer under Article 90 and charges of disobeying an NCO under Article 91. *Id.* at *10-11. As a result, we concluded that, in cases

alleging maltreatment by an NCO, it is not enough to merely show that the accused is of higher enlisted rank than the person he or she allegedly maltreated.[8] *Id.* at *12.

Though not directly on point, we find the analysis in *Keller* instructive.[9] To answer whether SPC MR, the victim in *Keller*, was subject to Keller's orders we asked: "if SFC Keller had ordered SPC MR to take a position on the perimeter, or to direct weapons fire onto a certain target, or had stopped her on the base and told her to make a uniform correction, could SPC MR have disobeyed those orders without fear of being court-martialed?" *Id.* at *13. Having concluded that the answer was, "[c]ertainly not," we found SPC MR was subject to Keller's orders for the purposes of Article 93.[10]

Similarly, in this case, we must ask whether PFC PC had a duty to obey lawful orders from appellant. We conclude she did.

Private First Class PC was a junior soldier in appellant's battalion. She testified that being an ATC trainee was her first duty assignment and, at the time of the offense, she had only been at Fort Rucker a few months. Based on customs of the service in the Army, we are convinced that if appellant ordered her to correct a

---

[8] For offenses under Article 90, it is enough to show that the officer is of higher rank than the accused, whereas under Article 91 the accused must be have a duty to obey *the* order of the NCO. By extension, we infer enlisted soldiers generally have a duty to obey all lawful orders from officers but not necessarily every lawful order from NCOs.

[9] We acknowledge that two of our sister courts have reached a narrower reading of the term "subject to the orders." *See United States v. Sullivan*, 2016 CCA LEXIS 404 (C.G. Ct. Crim. App. 13 Jul. 2016); *United States v. Curry*, 1991 CMR LEXIS 1144 (N.C.M.R. 31 Jul. 1991). We find it important, however, to acknowledge the customs of the services may differ as to the expectations of junior enlisted members to obey the orders of NCOs. For example, the nature of combat for the Navy and Coast Guard is very different than combat in the Army. The fluidity of ground-based combat may have led us in the Army to slightly different customs and expectations than our maritime-focused brethren. We do not presume to speak to the customs of our sister services. Also, we find both cases from our sister courts factually distinguishable from the situation in both this case and *Keller*.

[10] The offenses in *Keller* arose on a deployment in Kosovo. The victim was not in the same unit as Keller and their actual interaction was at night in a non-official setting. We found the deployed environment was one of the important factors in analyzing whether SPC MR was subject to Keller's orders.

9

uniform deficiency, pick up trash, come to the position of parade rest and stop talking, or take a message to her First Sergeant, PFC PC would have been obliged to obey.

The Soldier's Guide teaches junior enlisted soldiers to:

> • Obey the lawful orders of NCOs and officers.
> • Treat others with dignity and respect.
> • Complete each task to the very best degree possible and not just to standard.
> • Maintain a military appearance.
> • Maintain individual physical fitness standards and readiness.
> • Maintain individual equipment and clothing to standard.

Dep't of Army Training Circular 7-21.13, Soldier's Guide [Soldier's Guide], para. 4-9 (30 Nov. 2015).[11]

The Soldier's Guide elaborates on general military authority—as opposed to direct command authority—as follows:

> [General military authority] originates in oaths of office and enlistment, law, rank structure, traditions, and regulations. This broad-based authority allows leaders to take appropriate corrective actions whenever a member of the armed services commits an act involving a breach of good order and discipline. Army Regulation 600-20, [sic] specifically gives this authority to commissioned, warrant, and noncommissioned officers.

Soldier's Guide, para. 4-11.a(2). In other words, in the Army, junior enlisted soldiers are trained to comply with lawful orders from officers and NCOs without inquiring into the basis for such orders. *See also* Army Reg. 600-20, Army Command Policy, para. 4-2 (6 Nov. 2014) ("All persons in the military Service are required to strictly obey and promptly execute the legal orders of their lawful seniors.").

---

[11] Training Circular 7-21.13 became effective shortly before the events at issue in this case. The Training Circular replaced Dep't of Army Field Manual 7-21-3, The Soldier's Guide (2 Feb. 2004) [FM 7-21-3]. The Field Manual version of the Soldier's Guide included almost identical language. FM 7-21-3 at para. 3-21.

As set out in the Soldier's Guide, we find it is a custom of the service in the Army that junior enlisted soldiers—meaning the ranks of Private E1 through Specialist—generally have at least some duty to obey lawful orders of NCOs.[12] We acknowledge that this is potentially a broad conclusion, but we believe it accurately reflects the actual custom of service in the Army. In basic training, we do not instruct our soldiers which NCOs they must obey and which they can ignore. In the modern Army, different units often serve together in a single task force, or are otherwise comingled. In a deployed setting, there might be half a dozen or more units on a base, all sharing responsibility for accomplishing a mission.

There is an inherent tension when we require a soldier to obey the lawful orders of higher ranking persons not in their chain of command. For both NCOs and officers, the Army resolves this tension by expecting obedience from junior enlisted soldiers, and expecting officers and NCOs to respect the chain of command and to exercise discretion when interacting outside their chain of command. *See* Army Doctrine Publication 6-22, Army Leadership, para. 2 (Aug. 2012).

We do not think the conclusion that junior enlisted soldiers have a duty to obey the lawful orders of NCOs—at least for the purposes of Article 93—is an overbroad reading of the law. For the purposes of the offense of maltreatment, the language of the UCMJ does not require the subordinate have a duty to obey *all* lawful orders of the superior in order to be "subject to the orders of" that superior. The *MCM* explains that the subordinate need merely have "some duty" to obey. *MCM*, Part IV, ¶17.c(1).[13]

---

[12] By "generally," we mean that the custom of the service we acknowledge in this opinion is only the custom in the usual case. Under extraordinary facts and circumstances, a particular junior soldier might have no duty whatsoever to obey a particular NCO. Such extraordinary facts and circumstances are simply not present in appellant's case. Further, nothing in this opinion should be construed as lessening the government's burden to prove every element of the offense beyond a reasonable doubt. The custom of the service in the Army is a supporting factor in the government's case, but it is not wholly dispositive of the element in question.

[13] The duty to obey in the offense of maltreatment under Article 93 and the duty to obey in the offense of disobeying an NCO under Article 91 are not quite the same. The issue in Article 91 turns on a superior NCO giving a lawful order and the subordinate having a duty to obey *that specific order*. In the context of maltreatment, however, the question is whether the subordinate has some duty to obey the lawful orders of the accused in the abstract. Soldiers never have a duty to obey unlawful orders.

Further, even if all junior enlisted soldiers in the Army did not have some duty to obey all NCOs in the Army, there is no question that PFC PC had a duty to obey appellant. This is not a case with soldiers from different installations who met off post, or even soldiers close in rank. In this case, appellant was an NCO of the grade E-7 and PFC PC was a junior enlisted soldier of the grade E-3. Appellant and PFC PC met at the barracks, and appellant was the supervisor of PFC PC's friend SPC BK. Appellant was an NCO in the same battalion as PFC PC. Under any reasonable reading of the facts, PFC PC was subject to appellant's lawful orders and appellant knew it.

## CONCLUSION

Appellant used his rank of Sergeant First Class to subject junior enlisted soldiers to his patently offensive sexual overtures. Leveraging his rank, appellant counted on the silence, if not the consent, of the soldiers he maltreated. Ultimately, he obtained neither. We find appellant's resulting convictions and sentence are correct in law and fact, and should be approved.

The findings of guilty and the sentence are AFFIRMED.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court